## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GOLDEN FORTUNE IMPORT & EXPORT
CORPORATION,

        Plaintiff,

   v.

MEI-XIN (HONG KONG) LIMITED and
MAXIM'S CATERERS LIMITED,

        Defendants.

Civil Action No. 22-01369 (JXN) (JRA)

**OPINION**

**NEALS**, District Judge

    **THIS MATTER** having been brought before the Court by the law firms of Chiesa Shahinian & Giantomasi, P.C., and Rauchway Law, LLC., as co-counsel for Plaintiff, Golden Fortune Import & Export Corporation ("Golden Fortune" or "Plaintiff"), by way of a Verified Complaint (ECF No. 1) and application by Order to Show Cause for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65 (ECF No. 3), Defendants Mei-Xin Limited and Maxim's Caterers Limited, (respectively "Mei-Xin;" "Maxim's;" or collectively "Defendants") having filed opposition to the application (ECF No. 9) and a Cross Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(2) (ECF No. 10), through their counsel Duane Morris, LLP. The Court having heard oral argument and in consideration of the parties' submissions, for the reasons set forth below, Plaintiff's application by Order to Show Cause for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65 (ECF No. 3) is **GRANTED**, and Defendants' Cross Motion to Dismiss (ECF No. 10) is **ADMNISTRATIVELY TERMINATED**.

## I.     BACKGROUND

This Court has subject matter jurisdiction based upon 28 U.S.C. 1332(a)(2).  Venue is proper pursuant to 28 U.S.C. 1391(b)(2).

Golden Fortune Import & Export Corporation (defined above as "Golden Fortune" or "Plaintiff") is a New Jersey corporation having its principal place of business at 55 Hook Road, Bayonne, New Jersey. Compl., at ¶ 9. Golden Fortune imports and distributes Asian groceries in the United States. *See Id.*, at ¶ 14. Defendant Mei-Xin (Hong Kong) Limited is a Hong Kong company with its principal place of business at 18/F, Maxim's Centre, No. 17 Cheung Sun Street, Cheung Sha Wan, Kowloon, Hong Kong.  *Id.* at ¶ 10. Defendant Maxim Caterers Limited is a Hong Kong company and parent company of Mei-Xin, with its principal place of business at 18/F, Maxim's Centre, No. 17 Cheung Sun Street, Cheung Sha Wan, Kowloon, Hong Kong.[1] *Id.* at ¶ 11.

Mei-Xin manufactures mooncakes and other pre-packaged bakery products. *See* Declaration of YU Yuet Fun Alice ("Alice Decl."), at ¶ 3. Mei-Xin's products, and, in particular, its mooncakes branded as "Hong Kong MX," enjoy an unparalleled reputation overseas due to their use of high-quality ingredients and innovative flavors (e.g., lava custard mooncake with molten filling). Alice Decl., at ¶ 4. Hong Kong MX-branded mooncakes have been sold to the public for well over thirty-years (Alice Decl., at ¶ 5), and they are frequently referred to by international media as the most "iconic," "high-quality" and "best- selling" mooncakes on the market.[2] Hong Kong MX-branded mooncakes have been distributed internationally since the

---

[1] Plaintiff alleges that Maxim's Caterers has a majority interest in Mei-Xin and/or effectively controls Mei-Xin. Plaintiff further alleges all or most of numerous employees with whom Golden Fortune has dealt in connection with the parties' relationship (including the purported termination thereof) are employees of Maxim's as shown by their LinkedIn profiles and email domains (which contain the "Maxim" name). *Id.* at ¶ 15.

[2] *See* Buenaventura, Marie, "Over The Moon With Mooncakes," Manilla Bulletin, *available at*: https://mb.com.ph/2021/09/02/over-the-moon-with- mooncakes/ (last visited Mar. 20, 2022); Metro Style

1990s, including to Canada, United Kingdom, Taiwan, Singapore, Philippines, New Zealand and South Africa. *Id.*

Prior to 2000, Maxim's Caterer's sold MX Mooncakes only in Hong Kong, and therefore had no overseas presence or market share. Compl. at ¶ 19.  Because it lacked goodwill or any United States-based sales team or advertising (in fact, Mei-Xin still has no United States-based sales team or advertising), Mei-Xin engaged two non-exclusive United States-based distributors, one of which was Golden Fortune. Alice Decl., at ¶ 9.[3] In 2000, Maxim's engaged Golden Fortune to establish and develop a market for the MX Mooncakes brand in the eastern portion of the United States. *Id.* at ¶ 21. In or about 2001, due to its increasing sales in Hong Kong and the international market, Mei-Xin determined to sell its products in the United States. Alice Decl., at ¶ 6. Maxim's engagement of Golden Fortune also gave Maxim's access to Golden Fortune's extensive list of supermarket and wholesale customers, as well as the selling power of Golden Fortune's highly experienced and motivated sales and marketing team. Compl., at ¶ 23. Golden Fortune has been Maxim's exclusive distributor for the eastern half of the United States for over twenty (20) years. *Id.*, at ¶ 32.

---

Team, "UPDATE: Hong Kong's Beloved Mooncake Has Exciting New Flavors," Metro.Style, *available at*: https://metro.style/food/features/hong-kong-s-beloved-mooncake/31085 (last visited Mar. 20, 2022); "Dining In/Out (09/02/21)," BusinessWorld, *available at*: https://www.bworldonline.com/dining-in-out-09-02-21/ (last visited Mar. 20, 2022); Abellon,Bam V., "So Popular It's Peddled In The Black Market, HK's Bestselling Mooncake Is Now In Manila," AncX, *available at*: https://news.abs-cbn.com/ancx/food-drink/features/08/29/19/so-popular-its-peddled-in-the-black-market-hong-kongs-bestselling-mooncake-is-now-in-manila (last visited Mar. 20, 2022); Abrahams, Luke, "A Mooncake Pop-Up Is Bringing Magic To Chinatown," Evening Standard, *available at*: https://www.standard.co.uk/reveller/restaurants/a-mooncake-popup-is-bringing-magic-to-chinatown-a3658476.html (last visited Mar. 20, 2022).

[3] Mei-Xin's reputation at the time was largely tied to a festival celebrated in Asian countries, the Mid-Autumn Festival, which is an ancient festival marking the traditional time of harvest. Alice Decl., at ¶ 7. The Mid- Autumn Festival is widely celebrated in Hong Kong, mainland China, Taiwan, Macau and Vietnam. *Id.*, at ¶ 8.

Golden Fortune has over "40 years of experience sourcing high quality products" from around the globe, and uses a "dedicated purchasing team [to] constantly plac[e] orders with reputable manufacturers in Asia to import the best Asian food products into the United States." *See* Declaration of Sarah Fehm Stewart ("Stewart Decl."), Exs. 1-2. As a result of this deep experience and broad efforts, Golden Fortune imports and distributes at least 1,599 different products from over 150 brands. Stewart Decl., Exs. 3-4. The products include dried, frozen, refrigerated, seasonal, canned and bottled items such as beverages, snacks, sauces, rice, noodles and more. *See* Stewart Decl., Ex. 1. The brands include large, internationally recognized companies such as Kraft, Nestle, Nissin, Knorr and Spam. *See* Stewart Decl., Ex. 4. Golden Fortune displays the logos from the "150+ brands on its website and LinkedIn page, and represents itself as providing wholesale distribution services for many 'famous' and 'common' brands." *See* Stewart Decl., Ex. 5. Golden Fortune's website does not describe itself as uniquely tied to the Hong Kong MX brand. *See* Stewart Decl., Ex. 6. Rather, Hong Kong MX is listed among the 150+ brands. *See* Stewart Decl., Ex. 6.  In addition to selling its own branded products and providing import and distribution services, Golden Fortune also offers full-service logistics, marketing and warehousing services to all of its customers. *See* Stewart Decl., Ex. 1.

Golden Fortune owns and operates a massive 270,000 square foot warehouse with 21 exterior loading docks and 16 interior loading docks in Bayonne, New Jersey. The company also has a custom- built 30,000 square foot walk-in cooler and freezer for refrigerated and frozen goods. *See* Stewart Decl., Ex. 1. Golden Fortune has operated out of its Bayonne, New Jersey warehouse since the inception of the relationship between Golden Fortune and Maxim's. Compl., at ¶ 47. At Golden Fortune's Bayonne warehouse, Golden Fortune's personnel make calls to customers. Golden Fortune's warehouse is also the location from which Golden Fortune's goods – including

4

MX Mooncakes – are delivered to customers. *Id.*, at ¶ 48. Additionally, some customers choose to pick up MX Mooncakes from Golden Fortune's warehouse to be the first to start selling the coveted MX Mooncakes to their customers for the Mid-Autumn Festival. As a result, Golden Fortune also displays MX Mooncakes promotional material in their Bayonne, New Jersey location. *Id.*, at ¶ 49.

In 2021, Golden Fortune and Mei-Xin executed the most recent agreement between the parties (the "Distribution Agreement"). *Id.*, at ¶ 35; Ex. B. The Distribution Agreement names Golden Fortune's Bayonne, New Jersey warehouse address on the front page of the Distribution Agreement. Compl., at ¶ 46. Pursuant to the Agreement, Golden Fortune is required to distribute certain Mei-Xin goods, including Hong Kong MX-branded mooncakes, only in the eastern United States and Panama. Compl., Ex. B at § 4 and Standard Terms ¶ 2. Specifically:

> Subject to these Terms, the Buyer shall buy and the Company shall sell the Goods at the Price.
>
> *The Company hereby appoints the Buyer as Company's distributor of the Goods (as defined above) only in the Territory during the Term. For avoidance of doubt, the Company is still entitled to grant exclusive or non-exclusive distribution rights to other third party in the Territory and outside the Territory to distribute, sell and market all of or part of the Company's Goods without in (sic) breach of this Agreement.* Without derogating from the generality of this clause 2, the Buyer agrees and undertakes that it will source and purchase all goods (including the Goods) supplied by the Company only and not by any third party.
>
> The Buyer shall not solicit sales of Goods or promote the sale of Goods outside the Territory. The Buyer shall not establish an office or warehouse outside the Territory for the sale of Goods. The Buyer shall be solely responsible for all and any claims, disputes, complaints or otherwise issues directly or indirectly relating to or arising out of the Goods which are sold by the Buyer to purchasers, customers and consumers in the Territory.

Compl., Ex. B at § 4 and Standard Terms ¶ 2 (emphasis added).

The Agreement places restrictions on Golden Fortune's promotion and use of Mei-Xin's name, trademark, service mark, trade dress or logo, and requires Golden Fortune to obtain Mei-Xin's express prior written consent to use same in any promotional materials. Compl., Ex. B at

Standard Terms ¶ 6.1; Alice Decl., at ¶ 14. The Agreement further warns Golden Fortune against "tamper[ing] with any markings or name plates or other indication of the source of origin of the Goods which may be placed by the Company on the Goods or the packaging thereof." Compl., Ex. B at Standard Terms ¶ 6.3. The Agreement restricts Golden Fortune from ever using the name of Mei-Xin's corporate parent, Maxim's: "The Buyer undertakes not to use the English word 'Maxim's' on any promotional or advertising materials or in any manner whatsoever." Compl., Ex. B at Standard Terms ¶ 6.4. Moreover, the Agreement specifies that Mei-Xin and Golden Fortune are "independent parties" and "[n]othing in th[e] Agreement shall be deemed to create any association, partnership, joint venture or agency." Compl., Ex. B at Standard Terms ¶ 16.

The Agreement contains termination provisions and choice of law and arbitration clauses, which provide, in relevant part:

7.     <u>Termination</u>
7.1     Except where Clause 7.2 of applies, either the Company or the Buyer shall have right to terminate this Agreement during the Term by giving the other thirty-day (30) day written notice.

7.2     The Company is entitled to terminate this Agreement immediately without notice in any of the following event:
       (a)   there is non-compliance with any provision of this Agreement on the part of the Buyer; or
       (b)   there is major shareholding change of the Buyer or the Buyer becomes insolvent, reorganizes, or liquidates, or a receiver is appointed over the Buyer's property.

       \*         \*         \*

19.     <u>Applicable Law</u>
This Agreement shall be governed by and construed in accordance with the laws of Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong").

20.     <u>Arbitration</u>
Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules in

accordance with the Hong Kong International Arbitration Centre ("HKIAC") Procedures for the Administration of International Arbitration. There shall be only one arbitrator. The appointing authority shall be HKIAC. The place of arbitration shall be in Hong Kong at Hong Kong International Arbitration Centre.

Compl., Ex. B at Standard Terms ¶¶ 7.1, 7.2, 19, 20.

Over a period of 20 years, Golden Fortune's efforts have resulted in MX Mooncakes going from an unknown brand in the United States to becoming the #1 mooncake brand in the United States eastern region. Compl., at ¶ 56.

According to Defendants, in 2013, the gross sales value received by Mei-Xin for these goods was approximately $1,044,000, up 23% from the previous year. Alice Decl., at ¶ 16. In 2014, the gross sales value received by Mei-Xin for these goods was approximately $1,273,000, up $22% from the previous year. *Id*., at ¶ 16. In 2015, the gross sales value received by Mei-Xin for these goods was approximately $1,403,000, up 10% from the previous year. *Id*. In 2016, the gross sales value received by Mei-Xin for these goods was approximately $1,589,000, up 13% from the previous year. *Id*. Thus, from 2013 through 2016, Golden Fortune achieved double-digit growth on a yearly basis. *Id*.

Defendants further contend that in 2017 – coinciding with Golden Fortune 50% owner, Frank Ng, leaving the company – growth began to decline. *Id*., at ¶ 17; Compl., at ¶ 102. For example, in 2017, the gross sales value received by Mei-Xin for these goods was approximately $1,707,000, just up 7% from the previous year. Alice Decl., at ¶ 18. Similarly, in 2019, the gross sales value received by Mei-Xin for these goods was approximately $2,114,000, up only 6% from the previous year. *Id*. In 2020, the gross sales value received by Mei-Xin for these goods was approximately $1,500,000, down some 29% from the previous year. *Id*. In 2020, Mei-Xin warned Golden Fortune that it may move its distribution to Frank Ng's new company, TKS, if sales did not sufficiently improve. *Id*., at ¶ 19.

Golden Fortune's tax return for its fiscal year, September 1, 2018 and August 31, 2019, reveals annual gross revenue of $45,720,201. Compl., at ¶ 97. Golden Fortune's gross sales of Maxim's products between September 1, 2018 and August 31, 2019, was approximately $3,959,887. *Id*., at ¶ 98. Plaintiff alleges the following in its Complaint to calculate the percentage of Golden Fortune's gross sales attributable to Defendants:

> As Maxim's products are the only significant seasonal product that Golden Fortune sells, these numbers provide for an approximate sales volume – removing Maxim's sales – of quarterly sales of $10,440,079 (($45,720,201 minus $3,959,887) divided by 4).

*Id*., at ¶ 99.

> Adding back in Golden Fortune's Maxim's sales during the period between July 2019 and September 2019 ($3,305,575), the total sales during this period is $13,745,654 ($3,305,575 + $10,440,079), resulting in sales of Maxim's products during this period constituting a percentage of approximately 24% ($3,305,575 divided by $13,745,654).

*Id*., at ¶ 100.

Golden Fortune learned that Defendants selected the company TKS to replace Golden Fortune as its new distributor. TKS was started by the former fifty percent (50%) owner of Golden Fortune and offers many of the same product offerings to Asian supermarkets as Golden Fortune sells. *Id*., at ¶ 102. TKS advertised on its website that it is a "partner" of "Hong Kong MX Mooncakes." Compl., at ¶ 103, Ex. X. Plaintiff alleges "[a]s a result, Golden Fortune's supermarket customers who normally purchase MX Mooncakes along with other Asian food products from Golden Fortune will inevitably, absent injunctive relief, move their entire purchase orders to TKS." Compl., at ¶ 105.

Defendants contend that after six years of slowing sales and contractual breaches[4] following the exit of Frank Ng from Golden Fortune, on January 21, 2022, Mei-Xin sent a notice of termination to Golden Fortune by email. Alice Decl., at ¶ 26 and Ex. A. Golden Fortune replied to this email, claiming that the termination was invalid because it did not constitute written notice under Sections 7.1 and 11 of the Agreement. *Id.* In response, Mei-Xin sent a written notice of termination to Golden Fortune on March 3, 2022. *Id.*, at ¶ 27.

On March 7, 2022, Golden Fortune responded to the written notice of termination, claiming that the notice of termination is invalid under the New Jersey Franchise Practices Act ("NJFPA").[5] *Id.*, at ¶ 28. On March 10, 2022, Mei-Xin replied to Golden Fortune, explaining that the NJFPA does not apply, and reiterating its termination of the Agreement. *Id.*, at ¶ 29. Mei-Xin has now engaged TKS to distribute Mei-Xin's goods in the eastern United States. *Id.*, at ¶ 30.

On March 14, 2022, Golden Fortune initiated the instant action in the United States District Court for the District of New Jersey, naming Mei-Xin and its corporate parent, Maxim's, as defendants. *See generally* Compl. In its Complaint, Golden Fortune alleges three causes of action for violation of the NJFPA, breach of the implied covenant of good faith and fair dealing and tortious interference, as well as a cause of action seeking declaratory judgment and an injunction in its favor, namely a "declaration and adjudication that (a) Golden Fortune continues to be Maxim's exclusive distributor . . . (b) all previous efforts by Mei-Xin or Maxim's Caterers to

---

[4] Defendants offered the following contentions as to contractual breaches. For example, in September 2017, Mei-Xin learned that Hong Kong MX-branded mooncakes were being sold in Texas supermarkets, and had been distributed by Golden Fortune. Alice Decl., ¶ 26 and n.1. Texas is outside Golden Fortune's territory. *Id.*, ¶ 26 and n. 1. In September 2018, Mei-Xin learned that Hong Kong MX-branded mooncakes were being sold in an Oklahoma supermarket, and had been distributed by Golden Fortune. *Id.* Oklahoma is outside Golden Fortune's territory. *Id.* In September 2019, Mei-Xin learned that Hong Kong MX-branded mooncakes were again being sold in Texas supermarkets, and had been distributed by Golden Fortune. *Id.*

[5] New Jersey Franchise Practices Act, N.J.S.A. 53:10-1, *et seq.*

terminate . . . have no force or effect; and (c) an injunction enjoining Mei-Xin and Maxim's Caterers from terminating Golden Fortune as the exclusive distributor." *See generally* Compl.

Golden Fortune further seeks a preliminary injunction "(a) barring Defendants from terminating or otherwise failing to renew Golden Fortune as Defendants' exclusive distributor of Defendants' products in the eastern portion of the United States referenced in the agreement in the Verified Complaint and (b) barring the distribution of Defendants' products through any person or entity, other than Golden Fortune, in the eastern portion of the United States referenced in the agreement in the Verified Complaint[.]" *See generally* Order to Show Cause ("OSC"). (ECF No. 9, 10).

Defendants oppose the application (ECF No. 9) and filed a Cross Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(2) (ECF No. 10).

## II. STANDARD OF REVIEW

### A.    Jurisdictional Analysis[6]

As a threshold issue, the Court must determine whether it may properly exercise jurisdiction over Defendants. Defendants assert that they are foreign corporations with no presence in the United States. Alice Decl., at ¶ 34. Neither Mei-Xin nor Maxim's maintain a place of business in New Jersey, and neither Mei-Xin nor Maxim's are registered to do business in New Jersey or otherwise invoke New Jersey's laws. *Id*., at ¶ 34. Mei-Xin and Maxim's do not conduct any real business in New Jersey. *Id*., at ¶ 35. In fact, Maxim's conducts no business in New Jersey, and Mei-Xin's New Jersey business is limited to the distribution of its products by Golden Fortune pursuant to the Agreement. *Id*.- Maxim's is not a party to that Agreement. *Id*., at ¶ 33. Moreover,

---

[6] Service upon Defendants was effectuated pursuant to Fed. R. Civ. P. 4(f)(3).  See Declaration of David M. Dugan (ECF 14).

the Agreement was negotiated and signed by Mei-Xin in Hong Kong. *Id*., at ¶ 36. Mei-Xin has not visited New Jersey in connection with negotiating or signing the Agreement. *Id*. And, more generally, neither Mei-Xin nor Maxim's own any property in New Jersey, hold any bank accounts in New Jersey, or otherwise have a physical presence in the State. *Id*., at ¶ 37. Neither Mei-Xin nor Maxim's have ever consented to jurisdiction in New Jersey. *Id*., at ¶ 38. Golden Fortune's location in New Jersey is incidental, as Mei-Xin, in entering the Agreement, was looking for a distributor to sell products in the entire eastern United States. *Id*., at ¶ 39. Mei-Xin does not target the New Jersey market specifically. *Id*., at ¶ 40.

Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation. *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). Motions to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), like those for failure to state a claim under Rule 12(b)(6), require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368 (3d Cir. 2002). When "[b]oth sides offer[ ] evidence on the personal jurisdiction issue," but "there has not been discovery or an evidentiary hearing, the plaintiff receives the benefit of what amounts to a Rule 12(b)(6) standard." *Murphy v. Eisai, Inc.*, 503 F.Supp.3d 207, 214 (D.N.J. 2020). Unlike Rule 12(b)(6), Rule 12(b)(2) does not limit the scope of the court's review to the face of the pleadings. *See id.; Carteret Sav. Bank, F.A. v. Shushan,* 954 F.2d 141, 142 & n. 1 (3d Cir. 1992). Consideration of affidavits submitted by the parties is appropriate and, typically, necessary. *Patterson by Patterson v. FBI,* 893 F.2d 595, 603–04 (3d Cir. 1990). Plaintiffs must merely allege sufficient facts to establish a *prima facie* case of jurisdiction over the person. *Id.* Once these allegations are contradicted by an opposing affidavit, however, plaintiffs

must present similar evidence in support of personal jurisdiction. *Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d 324, 330–31 (3d Cir. 2009); *Carteret Sav. Bank,* 954 F.2d at 142 & n. 1, 146; *Patterson,* 893 F.2d at 603–04.  When the plaintiff responds with affidavits or other evidence in support of its position, the court is bound to accept these representations and defer final determination as to the merits of the allegations until a pretrial hearing or the time of trial. *Carteret Sav. Bank,* 954 F.2d at 142 n. 1 (stating that the "plaintiff need only plead [a] *prima facie* case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence") (citing *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir. 1984)).

A federal court may exercise personal jurisdiction over a defendant to the extent authorized by state law. Fed. R. Civ. P. 4(k)(1)(A). New Jersey provides for jurisdiction coextensive with constitutional due process. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing N.J. CCt. R. 4:4-4). Due process allows for two types of personal jurisdiction, general or specific jurisdiction. *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 & n. 9 (1984).

A court exercising general jurisdiction may hear any claim against a defendant that possesses systematic and continuous contacts with the forum regardless of whether the claim resulted from the defendant's forum-related activities. *Id.* at 415 n. 9. The defendant must maintain perpetual, abiding ties with the forum. *Metcalfe,* 566 F.3d at 334; *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 262 (3d Cir. 2000). In the corporate context, courts have historically applied general jurisdiction to organizations that hire employees, hold real property, maintain bank accounts, apply for business licenses, advertise, and regularly solicit sales within

the relevant forum. *Metcalfe,* 566 F.3d at 335. General jurisdiction is usually found where a non-resident defendant makes a substantial number of direct sales in the forum, solicits business regularly and advertises in a way specifically targeted at the forum market. *See id.,* (predicating general jurisdiction upon fewer than twenty sales directly to consumers within the forum).

In contrast, specific jurisdiction enables a court to hear claims that arise from a defendant's contacts with the forum where the court sits. *Helicopteros,* 466 U.S. at 414 n. 8. The inquiry as to whether specific jurisdiction exists has three parts. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d. Cir. 2007). First, the defendant must have "purposefully directed [its] activities" at the forum. *Id.,* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)) (quotation marks omitted). Second, the litigation must "arise out of or relate to" at least one of those activities. *Id.,* (citing *Helicopteros,* 466 U.S. at 414; *Grimes v. Vitalink Commc'ns Corp.,* 17 F.3d 1553, 1559 (3d Cir. 1994)). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Id.,* (citing *Burger King,* 471 U.S. at 476) (quoting Int'l Shoe *Co. v. Washington,* 326 U.S. 310, 320 (1945)).

Although Defendants allegedly make substantial sales of their Mooncakes in New Jersey, the Court will review jurisdiction under the specific category due to the apparent lack of a corporate presence in New Jersey based on the facts presented at bar.[7]

### i. Purposeful Availment

Preliminarily, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum." *O'Connor*, 496 F.3d at 317, citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958). Physical entrance is not required. *Id., See Burger King,* 471 U.S. at 476, 105

---

[7] *See* Alice Decl., ¶¶ 34 – 38, *et seq*.

S.Ct. 2174; *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction."). "[W]hat is necessary is a deliberate targeting of the forum." *O'Connor*, 496 F.3d at 317. "[R]andom, isolated, or fortuitous" contacts with the forum will not do. *Ford Motor Company v. Montana Eighth Judicial District*, 141 S. Ct. 1017, 1024 (2021). "Each defendant's contacts with the forum state must be assessed individually." *Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 184 (3d Cir. 2000) (citation omitted); *O'Connor*, 496 F.3d at 317.

Here, Plaintiff set out a series of claim specific contacts in the Complaint, which sufficiently allege that Defendants purposefully availed themselves in New Jersey. Mei-Xin engaged two non-exclusive United States-based distributors, one of which was Golden Fortune. Alice Decl., at ¶ 9. In 2000, Maxim's engaged Golden Fortune to establish and develop a market for the MX Mooncakes brand in the eastern portion of the United States. *Id.* at ¶ 21; Compl., at ¶ 42. Maxim's engagement of Golden Fortune also gave Maxim's access to Golden Fortune's extensive list of supermarket and wholesale customers, as well as the selling power of Golden Fortune's highly experienced and motivated sales and marketing team. Compl., at ¶ 23. Golden Fortune has been Maxim's exclusive distributor for the eastern half of the United States for over twenty (20) years. *Id.,* at ¶ 32. Golden Fortune has operated out of its Bayonne, New Jersey warehouse since the inception of the relationship between Golden Fortune and Maxim's. *Id.*, at ¶ 47. At Golden Fortune's Bayonne warehouse, Golden Fortune's personnel make calls to customers. Golden Fortune's warehouse is also the location from which Golden Fortune's goods – including MX Mooncakes – are delivered to customers. *Id.*, at ¶ 48. Customers pick up MX Mooncakes from Golden Fortune's warehouse so as to be the first to start selling the coveted MX

Mooncakes to their customers for the Mid-Autumn Festival. As a result, Golden Fortune also displays MX Mooncakes promotional material in their Bayonne, New Jersey location. *Id.*, at ¶ 49. Over a period of 20 years, Golden Fortune's efforts have resulted in MX Mooncakes going from an unknown brand in the United States to becoming the #1 mooncake brand in the United States eastern region. *Id.*, at ¶ 56.

Defendants have equally set forth facts that demonstrate purposeful availment in this forum. Because it lacked goodwill or any United States-based sales team or advertising (in fact, Mei-Xin still has no United States-based sales team or advertising), Mei-Xin engaged two non-exclusive United States-based distributors, one of which was Golden Fortune. Alice Decl., at ¶ 9. Golden Fortune has over "40 years of experience sourcing high quality products" from around the globe, and utilizes a "dedicated purchasing team [to] constantly plac[e] orders with reputable manufacturers in Asia to import the best Asian food products into the United States." Stewart Decl., Exs. 1-2. Pursuant to the Agreement, Golden Fortune is required to distribute certain Mei-Xin goods, including Hong Kong MX-branded mooncakes, only in the eastern United States and Panama. Compl., Ex. B at § 4 and Standard Terms ¶ 2. According to Defendants, in 2013, the gross sales value received by Mei-Xin for these goods was approximately $1,044,000, up 23% from the previous year. Alice Decl., at ¶ 16. In 2014, the gross sales value received by Mei-Xin for these goods was approximately $1,273,000, up $22% from the previous year. *Id.*, at ¶ 16. In 2015, the gross sales value received by Mei-Xin for these goods was approximately $1,403,000, up 10% from the previous year. *Id.* In 2016, the gross sales value received by Mei-Xin for these goods was approximately $1,589,000, up 13% from the previous year. *Id.* Thus, from 2013 through 2016, Golden Fortune achieved double-digit growth on a yearly basis. *Id.* The Agreement places restrictions on Golden Fortune's promotion and use of Mei-Xin's name, trademark, service mark,

trade dress or logo, and requires Golden Fortune to obtain Mei-Xin's express prior written consent to use same in any promotional materials. Compl., Ex. B at Standard Terms ¶ 6.1; Alice Decl., at ¶ 14. Golden Fortune's gross sales of Maxim's products between September 1, 2018, and August 31, 2019, was approximately $3,959,887. Compl., at ¶ 98.

Consequently, at least for present purposes, if Plaintiff's and Defendants' allegations are taken as true, there is a sufficient showing that Defendants purposefully availed themselves of the privilege of doing business in New Jersey. *See O'Connor*, 496 F.3d at 317*; Miller Yacht Sales,* 384 F.3d at 97.

### ii. Claims Arise out of or Relate to Defendant's Activities

After establishing purposeful contacts in the forum, the plaintiff's claims must also "arise out of or relate to" at least one of those contacts. *Helicopteros*, 466 U.S. at 414; *Grimes*, 17 F.3d at 155. Whether a plaintiff's claims "arise out of or relate to" the defendant's contacts with the forum state depends, in part, on the type of claim brought. *See O'Connor*, 496 F.3d at 317 (quoting *Helicopteros*, 466 U.S. at 414.) For contract claims, a plaintiff must satisfy a "restrictive standard" by showing proximate causation (also called "substantive relevance"). *O'Connor*, 496 F.3d at 318, 320. But-for causation is not enough: "[T]he defendant's contacts with the forum [must have been] *instrumental* in either the formation of the contract or its breach." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d. Cir. 2020) (citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)) (emphasis added). A plaintiff cannot simply allege that "but for *x*'s occurrence, *y* (which may have been remote and not foreseeable) would not have happened." *Id*.

Here, it is readily apparent that the claims arise out of or relate to the Defendants' activities in New Jersey. The Defendants' contacts were based upon the parties' Distribution Agreement

thereby instrumental to not only the formation of the contract but also the allegations that serve as the basis for its breach. The pleadings that both parties have filed in the action indicate that Plaintiff's claims arise out of the Defendants' contacts with New Jersey. Namely, the marketing and sale of its products pursuant to its Distribution Agreement with Plaintiff, through Plaintiff's Bayonne warehouse. This involves extensive distribution activities in New Jersey that serve not only New Jersey but also the eastern portion of the United States.  Accordingly, Plaintiff has alleged sufficient facts to establish a prima facie case that the claims arise out of or relate to Defendants' contacts with New Jersey.  Consequently, Plaintiff satisfies the second prong of the *O'Connor* test.

### iii. Appropriate Exercise of Personal Jurisdiction

Having determined that sufficient minimum contacts exist, the Court must review whether exercising personal jurisdiction offends the "traditional notions of fair play and substantial justice." *O'Connor*, 496 F.3d at 317, citing *Int'l Shoe Co.,* 326 U.S. at 316 (internal quotation omitted). The existence of minimum contacts makes jurisdiction presumptively constitutional, and the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor*, 496 F.3d at 324; *see also Burger King,* 471 U.S. at 477; *see also Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 207 (3d Cir. 1998) (noting that if minimum contacts are present, then jurisdiction will be unreasonable only in "rare cases"); *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 483 (3d Cir. 1993) ("The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy.")

The Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are "the burden on the defendant, the forum

State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies," *O'Connor*, 496 F.3d at 325, citing *Burger King*, 471 U.S. at 477(quotation marks omitted), and "[t]he procedural and substantive interests of other nations." *O'Connor*, 496 F.3d at 324, citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 115 (1987).

Having found that Defendants have minimum contacts with New Jersey under the first two steps of the Court's analysis, Defendants must make a "compelling case" that litigation in New Jersey would be unreasonable and unfair. *See Burger King*, 471 U.S. at 477. As the Supreme Court has stated, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *See Asahi*, 480 U.S. at 114.  *Asahi* involved a suit in California between parties from Japan and Taiwan wherein the Court declined to exercise jurisdiction. *See id*. Unlike California's "slight" interest in that case, *id.*, New Jersey has a "manifest interest in providing effective means of redress" when a foreign corporation reaches into the state and solicits its citizens. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223(1957). New Jersey's manifest interest is clearly evidenced by the passage of the NJFPA.  The New Jersey Legislature plainly stated the state's "manifest interest" in the Legislative findings and declarations within the NJFPA:

> The Legislature finds and declares that *distribution and sales through franchise arrangements in the State of New Jersey vitally affects the general economy of the State, the public interest and the public welfare.* It is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements and to protect franchisees from unreasonable termination by franchisors that may result from a disparity of bargaining power between national and regional franchisors and small franchisees. *The Legislature finds that these protections are necessary to protect not only retail businesses, but also wholesale distribution franchisees that, through their efforts, enhance the reputation and goodwill of franchisors in this State. Further, the*

> *Legislature declares that the courts have in some cases more narrowly construed the Franchise Practices Act than was intended by the Legislature.*

N.J.S.A. 56:10-2 (emphasis added).

Furthermore, requiring Plaintiff to litigate in China would saddle them with a significant burden compared to Defendants' burden in New Jersey. The very purpose for the parties' Distribution Agreement was to sell Defendants' products in New Jersey and the other parts of the eastern United States, which Plaintiff has done for over twenty years through its Bayonne, New Jersey warehouse. Compl., at ¶¶ 21, 32.

In light of these countervailing interests, the Court concludes that this is not one of those "rare" and "compelling" cases where jurisdiction would be unreasonable despite the presence of minimum contacts. The burdens on Defendants may be substantial, but they "do not dwarf the interests of Plaintiff and the forum state." *O'Connor*, 496 F.3d at 325. When minimum contacts exist, due process demands no more than a reasonable forum. *Id.* Defendants do not present a compelling case of unreasonableness, so the Court finds that jurisdiction in New Jersey "comport[s] with fair play and substantial justice." *Burger King,* 471 U.S. at 476.

Having found that the Court's exercise of jurisdiction is proper, the Court will review whether Plaintiff is entitled to the protections of the NJFPA and a preliminary injunction.

### B. <u>The New Jersey Franchise Practices Act</u>

The NJFPA provides:

This act applies only:

to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise;

N.J.S.A. 56:10-4(a).

Pursuant to the NJFPA, in order to take advantage of the Act's protections an entity must first meet the statutory definition of a "franchise," which follows,

> "Franchise" means a *written arrangement* for a definite or indefinite period, in which a person grants to another person a *license* to use a trade name, trade mark, service mark, or related characteristics, and in which there is a *community of interest* in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. 56:10-3(a) (emphasis added). The Act has been interpreted to cast a broader net to encompass more diverse business relationships than the prototypical franchise situation such as a car dealership or fast-food restaurant. *Instructional Sys., Inc. v. Computer Curriculum Corp.,* 130 N.J. 324, 350(1992) ("*ISI*").

The Court must review each element, namely a written arrangement, a license and a community of interest to determine whether Plaintiff is entitled to the Act's protections.  Here, it is undisputed that the parties have a written arrangement between them as evidenced by the Distribution Agreement.  *See* Compl., Ex. B. The Court will address the remaining elements in turn.

### i. License Requirement

The New Jersey Supreme Court has held that "the Act's 'license to use' requirement does not encompass a definition of license in the word's broadest sense, that is: permission to do something [that] without the license would not be allowable." *ISI*, 130 N.J. 324. Simply allowing a franchisee to use the franchisor's insignia, an act that would normally "not be allowable" under trademark laws, does not in itself create a license. Otherwise, "any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." *Id.* (quoting *Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 120

(3d Cir. 1988). Rather, the meaning of "license" is more narrowly defined under the Act. It means "to use as if it is one's own. It implies a proprietary interest...." *Finlay & Assoc., Inc. v. Borg–Warner Corp.,* 146 N.J. Super. 210, 369 A.2d 541, 546 (Law Div. 1976), *aff'd on other grounds,* 155 N.J. Super. 331, 382 A.2d 933 (App.Div.), *certif. denied,* 77 N.J. 467(1978). The mere furnishing of advertising materials as contemplated by a distributorship agreement, and allowing a plaintiff to have its name placed on certain items if it so desires as advertising for itself, does not satisfy the Act. "[T]he trademark, tradename reference means and implies use of that name in the very business title of the franchisee and a holding out or perhaps representation to the public of some special relationship or connection." *Id.* Merely selling goods or distributing materials bearing the manufacturer's name or trademark does not "license" use of the "trademark." *Id.*

At a minimum, the term "license" means that the alleged franchisee must use the name of the franchisor "in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the ... licensor and the licensee by which the licensor vouches, as it were, for the activity of the licensee." *Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div., Litton Systems, Inc.,* 190 N.J. Super. 153, 160-161 (App.Div.1983) (noting that hallmark of a license is that the franchisor gives its approval to the franchisee's business enterprise with regard to the franchisor's product such that the public is induced "to expect from [the franchisee] a uniformly acceptable and quality controlled service endorsed by [the franchisor] itself") (cited in *ISI,* 130 N.J. at 354).The NJFPA license requirement contemplates an "obligation of the franchisee to promote the [franchisor's] [trade]mark itself, as distinct from merely using it to make sales[.]" *Liberty Sales Assocs., Inc. v. Dow Corning Corp.,*

816 F. Supp. 1004, 1011 (D.N.J. 1993) (no NJFPA license if manufacturer merely supplies displays and advertising materials).

In the instant case, the Distribution Agreement contains restrictive language as to Golden Fortune's promotion and use of Mei-Xin's name, trademark, service mark, trade dress or logo, and requires Golden Fortune to obtain Mei-Xin's express prior written consent to use same in any promotional materials. Compl., Ex. B at Standard Terms ¶ 6.1; Alice Decl., at ¶ 14. The Agreement further warns Golden Fortune against "tamper[ing] with any markings or name plates or other indication of the source of origin of the Goods which may be placed by the Company on the Goods or the packaging thereof." Compl., Ex. B at Standard Terms ¶ 6.3. The Agreement restricts Golden Fortune from ever using the name of Mei-Xin's corporate parent, Maxim's: "The Buyer undertakes not to use the English word 'Maxim's' on any promotional or advertising materials or in any manner whatsoever." Compl., Ex. B at Standard Terms at ¶ 6.4.

Plaintiff engaged in extensive marketing activities pursuant to the licensing provisions in the Distribution Agreement. Mei-Xin provided its consent for Golden Fortune to use Mei-Xin's intellectual property to promote Maxim's products by, without limitation, wrapping Golden Fortune's trucks with Maxim's logo and intellectual property and creating billboards and other promotional materials using Maxim's trademarks. Compl., at ¶ 38. Maxim's provided Golden Fortune display guides. While the display guides state that they are suggestions, Maxim's communicated to Golden Fortune that Golden Fortune had to comply with them in order to remain Maxim's distributor for the eastern half of the United States. *Id., at* ¶ 42. Golden Fortune also ordered voluminous point-of-sale materials from Maxim's to market MX Mooncakes in the eastern half of the United States, including, without limitation, several "Polo shirt[]" with MX Mooncakes branding that Golden Fortune's personnel routinely wore when promoting MX Mooncakes to the

public. *Id.*, at ¶ 43. For the MX Mooncakes that Golden Fortune sells in the United States, Maxim's stamps these products with both the "MX Mooncakes" branding and Golden Fortune's logo and company information. *Id.*, at ¶ 50.

Additionally, Maxim's has previously created and distributed certain instructional advertisements published in Chinese print media (magazines and newspapers) and social media advising consumers about the existence of counterfeit MX Mooncakes in the market and how to distinguish between genuine and counterfeit products. Among the identifiers, which include scanning QR codes and checking valid expiration dates, is the Golden Fortune marking that is branded on every box of the MX Mooncake sold in Golden Fortune's eastern United States territory. *Id.*, at ¶ 51. Moreover, Golden Fortune's representatives wear shirts with MX Mooncakes branding during countless demonstrations of MX Mooncakes products, emphasizing to the public that Golden Fortune was an arm of Maxim's. These maroon shirts with the MX Mooncakes branding can be seen in several photographs depicting Golden Fortune's representatives at MX Mooncakes demonstrations throughout Golden Fortune's territory in 2019. *Id.*, at ¶ 55. Golden Fortune also wrapped its trucks with MX Mooncake branding, which displayed the MX Mooncake logo alongside Golden Fortune's logo. A true and correct copy of email correspondence between Golden Fortune and Maxim's demonstrating Maxim's control and direction in the wrapping of Golden Fortune's delivery trucks …. *Id.*, at ¶ 67.

These extensive activities in conjunction with the longstanding relationship of the parties establish at this stage of the litigation that the trade name is used "in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee...." *See Neptune,* 190 N.J. Super. at 160-161. Moreover, these activities are far beyond "merely furnishing advertising materials to a dealer or authorizing the account to

display its name," *See e.g.*, *Liberty Sales Assocs.*, 816 F. Supp. 1004, thereby establishing a probability of success on the merits as to the license requirement.

### ii. Community of Interest

Under the Act, a community of interest means more than the mere fact that two parties share in the profits realized when a product makes its way from manufacturer to the ultimate consumer. *Neptune,* 190 N.J. Super. at 163. Courts analyzing whether an alleged franchisee is part of the class that is protected by the Act have looked for specific proof, focusing on certain indicia of control by the supposed franchisor over the supposed franchisee. *See, e.g., id.* at 163–64. "To develop goodwill generally for a product cannot be enough to create a community of interest. Otherwise, any licensee distributing a brand-name product could claim it has a community of interest with its supplier. For example, a department store selling Sony name products could claim a community of interest with the manufacturer despite the fact that the department store's goodwill investments are not intimately tied to the manufacturer and therefore lack the economic character of genuine franchise investments." *ISI*, 130 N.J. at 359. The community-of-interest standard "is based on the complex of mutual and continuing advantages which induced the franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him." *Id.* (citing *Neptune T.V.*, 190 N.J. Super at 163). The concept of community of interest is a "broad, elastic and elusive" concept, reflecting a "symbiotic character of a true franchise arrangement and the consequent vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities." *Id.* at 165.

The Third Circuit echoed that reasoning: "[C]ommunity of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee,

in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise." *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.,* 944 *F.*2d 1131, 1143 (3d Cir. 1991) (declaring whether relationship constitutes a franchise is a mixed question of fact and law). In *ISI*, the New Jersey court addressed the "interdependence" of the parties before it and found joint cooperation in resolving maintenance problems, joint representation at educational conventions, and joint cooperation in sales and marketing activities, as supportive of the concept. *Id.* at 365. In finding a community of interest, the *ISI* court also found that the franchisee had made intangible franchise-specific investments such as installing a base of clients, which would have been lost in the event of termination, and conducting customer studies assessing the product in question. *ISI*, 130 N.J. at 363–64.

 Likewise, Plaintiff here has developed a client base for Defendants in New Jersey and throughout the eastern United States, which Defendants did not have when it entered its first contract with Plaintiff twenty years ago. Compl., at ¶¶19, 21.  Defendants gained access to Plaintiff's supermarket and wholesale customers. *Id*., at ¶ 23. Golden Fortune has been Maxim's only distributor for the eastern half of the United States for over twenty (20) years. *Id*., at ¶ 32.

 Plaintiff also points to a litany of other intangibles. Plaintiff has operated out of its Bayonne, New Jersey warehouse since the inception of the relationship, where its personnel make calls to Defendants' customers; from which it delivers Defendants' mooncakes; at which customers pick up Defendants' mooncakes; and at which Plaintiff displays Defendants' MX Mooncakes promotional material. Compl., at ¶¶ 47-49.

 As previously set out relative to its licensing activities, with Defendants' consent, Plaintiff wrapped Golden Fortune's trucks with Maxim's logo, created billboards and other promotional materials using Maxim's trademarks. Compl., at ¶ 38. Plaintiff also ordered voluminous point-of-

sale materials from Maxim's to market MX Mooncakes in the eastern half of the United States, including, shirts with MX Mooncakes branding that Golden Fortune's personnel routinely wore when promoting MX Mooncakes to the public. *Id.*, at ¶ 43. These franchise-specific investments are not transferable to other manufacturers and cannot benefit other customers.

For purposes of satisfying the preliminary injunction requirement that the movant demonstrate a reasonable probability of success on the merits, the Court concludes that based on the record before it, the above examples of franchise-specific investment, which were required to be made and which were necessary to the conduct of the business, are sufficient for plaintiffs to meet their burden.

### iii. New Jersey Place of Business

The NJFPA applies only to an agreement "the performance of which *contemplates* or requires the franchisee to establish or maintain a place of business within the State of New Jersey." N.J.S.A. 56:10–4 (emphasis added). The NJFPA defines "place of business" as:

> a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, warehouse, a place of storage, a residence or a vehicle.

N.J.S.A. 56:10–3(f). The Act requires a sales location in New Jersey; mere distribution through an office or warehouse is insufficient. *ISI,* at 349 (quotation omitted).

In *ISI,* the New Jersey Supreme Court, in finding that plaintiff franchisee's facility was a place of business, noted that plaintiff ISI "ha[d] been giving more than one hundred demonstrations a year" at that facility, *ISI,* 130 N.J. at 350, and that ISI had used the facility to acquaint prospective purchasers with the functioning of its product. *Id.* ISI's only business location was a 6,000–square–foot facility on the sixth floor of a commercial office building in

Hackensack, New Jersey. *Id.* ISI specifically constructed its facility so that its franchisor's products could be demonstrated, and instruction given to customers. *Id.*

In the instant case, it cannot be contested to any significant degree whether Plaintiff maintained a New Jersey place of business in accordance with the Act.  As set out previously, the parties at minimum contemplated the establishment and maintenance of a New Jersey place of business.  Plaintiff's Bayonne warehouse appears on the face of the Distribution Agreement. Compl., at ¶ 46. Plaintiff has operated out of its Bayonne, New Jersey warehouse since the inception of the relationship. Compl., at ¶ 47. Deliveries, sales and marketing of Defendants' products all take place from Plaintiff's Bayonne warehouse. *Id.*, at 47–49.  Accordingly, the Act's place of business requirement is satisfied at this stage of the litigation.

### iv. NJFPA Sales Requirement

Having met the Act's definition of a franchise for purposes of Plaintiff's application for a preliminary injunction, the Act further maintains a sales threshold, which provides in relevant part:

> (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise;

N.J.S.A. 56:10-4(a)(2).

By its plain language, the statute does not set forth any particular time period within which to make the determination of whether the franchisee's gross sales satisfy the 20% requirement. The time limit is explicit only to and encapsulated within the Act's prong (2) $35,000 requirement. Additionally, the explicit language of prong (3) appears to allow for circumstances where the 20% requirement is met, but also where the 20% requirement is not met, but merely *intended* by the parties to be met. N.J.S.A. 56:10–4 (emphasis added). This understanding of prong (3) is consistent with the Court's discussion in *Colt Industries, Inc. v.. Fidelco Pump & Compressor*

*Corp.,* 700 F.Supp. 1330, 1334, n. 4 (D.N.J. 1987) ("Putting aside the language regarding 'intended' sales, which would presumably recognize situations in which the acts of the franchisor prevent the franchisee from meeting the statutory minimum, ..."), *aff'd,* 844 F.2d 117 (3d Cir. 1998). In the absence of an explicitly provided statutory time frame, a determination of what constitutes a reasonable time frame for meeting the requirement is a determination appropriately left for the trier of fact.  *See In re Faber Assocs.*, No. 16-2821, 2016 WL 11714223, at *2 (D.N.J. Dec. 13, 2016) ("Importantly. . . the 20% requirement does not feature a time period to determine whether the 20% threshold [is] met"); *see also*, *Harter Equip., Inc. v. Volvo Const. Equip. N. Am., Inc.*, No. 01-4040, 2003 WL 25889139, at *3 (D.N.J. Sept. 23, 2003).

In the Verified Complaint, Plaintiff contends that sales of Defendants' products did exceed 20%, at least at one time and alleges the following:

> 97. Golden Fortune's tax return for its fiscal year, September 1, 2018 and August 31, 2019, reveals annual gross revenue of $45,720,201….
>
> 98. Golden Fortune's gross sales of Maxim's products *between* September 1, 2018 and August 31, 2019, as Maxim's is aware, was approximately $3,959,887.
>
> 99. As Maxim's products are the only significant seasonal product that Golden Fortune sells, these numbers provide for an approximate sales volume – removing Maxim's sales – of quarterly sales of $10,440,079 (($45,720,201 minus $3,959,887) divided by 4).
>
> 100. Adding back in Golden Fortune's Maxim's sales during the period between July 2019 and September 2019 ($3,305,575), the total sales during this period is $13,745,654 ($3,305,575 + $10,440,079), resulting in sales of Maxim's products during this period constituting a percentage of approximately 24% ($3,305,575 divided by $13,745,654).

Compl., at ¶¶ 97 – 100 (emphasis added).

The Act's monetary requirements "single[] out for protection" the franchisees "that are especially vulnerable to the disproportionate power of franchisors." *Boyle v. Vanguard Car Rental USA, Inc.*, No. 08–6276, 2009 WL 3208310, at *5 (D.N.J. Sept. 30, 2009). In reviewing this

language, Courts must interpret the provision "consistent with its plain meaning." *Oberhand v. Dir., Div. of Taxation*, 193 N.J. 558, 940 (2008) (citation omitted). Here, the plain language proves clear (even if surprisingly broad), and compels, on its face, an inquiry into the scope of *intended* revenues, in addition to *actual* revenues. *See* N.J.S.A. 56:10–4 (emphasis added); *see also Liberty Lincoln–Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3d Cir. 1998) (citations omitted) (explaining that remedial statutes, like the NJFPA "must be construed broadly to give effect to their legislative purposes").

Here, there is no evidence in the record that the parties intended that revenue from Defendants' products would yield more than 20% of Plaintiff's gross sales. The inquiry then is limited to actual revenues. The mathematical gymnastics employed by Plaintiff to meet the 20% threshold appears to test the flexibility of the Act to its uppermost limits.[8]  The Act contains no controlling time period, however, and uses the disjunctive "or" relative to the parties' intentions as to the 20% threshold ((3) where more than 20% of the franchisee's gross sales are intended to be *or* are derived from such franchise. N.J.S.A. 56:10-4(a)(2) (emphasis added)).

As previously stated herein, the New Jersey Legislature has made clear that the Act's terms are to be interpreted broadly "to protect not only retail businesses, but also wholesale distribution franchisees that, through their efforts, enhance the reputation and goodwill of franchisors in this State." N.J.S.A. 56:10-2.  The Legislature further cautioned that "the courts have in some cases more narrowly construed the Franchise Practices Act than was intended by the Legislature." *Id.*

Because the Act has no specified period for the 20% of gross sales requirement, despite any potential weaknesses in Plaintiff's allegations, Plaintiff has arguably sufficiently pled the

---

[8] Plaintiff asserts that "During the peak sales season for MX Mooncakes (July through August annually), Golden Fortune generates well over twenty (20%) of its sales from sales of Maxim's products." Compl., at ¶ 91.

threshold requirement at this early procedural stage. *See*, e.g., *Harter,* No., 2003 WL 25889139, at *4.

### v. NJFPA Good Cause Termination Standard

The NJFPA contains a good cause requirement for termination and states in relevant part that:

> It shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

N.J.S.A. 56:10–5. The courts of New Jersey have consistently given effect to the plain meaning of this provision. *See, e.g., Dunkin' Donuts of America v. Middletown Donut Corp.,* 100 N.J. 166, 178(1985) (franchisee's attempt to defraud franchisor amounts to good cause under the plain language of the Act); *Shell Oil Co. v. Marinello,* 63 N.J. 402(1973), *cert. denied,* 415 U.S. 920 (1974).

The New Jersey legislature enacted the NJFPA to protect "the innocent franchisee when the termination occurs at the franchisor's convenience." *Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co.,* 86 N.J. 453, 432 (1981). The Act's concern is that once a business has made substantial franchise-specific investments it loses all or virtually all its original bargaining power regarding the continuation of the franchise. Specifically, the franchisee cannot do anything that risks termination, because that would result in a loss of much or all the value of its franchise-specific investments. Thus, the franchisee has no choice but to accede to the demands of the franchisor, no matter how unreasonable those demands may be. *Id.* at 62-63; *ISI* at 357;141.

As previously indicated, Plaintiff has sufficiently pled that it has made substantial franchise-specific investments in the distribution of Defendants' products thereby entitling it to

the Act's protections at this early stage of the litigation. Defendants have alleged termination grounds that on their face may appear reasonable and comport with the terms of the Distribution Agreement. Alice Decl., at ¶ 27. Plaintiff has sufficiently alleged, however, that the grounds provided by defendants to terminate the Distribution Agreement do not meet the good cause standard required under the Act. *See* Compl., at ¶¶ 79–86. Whether Defendants' grounds for termination meet the good cause standard set out in the Act, however, cannot be determined at this stage of the litigation.

### vi. The Arbitration Provision within the Distribution Agreement

The parties' Distribution Agreement requires that the parties submit their disputes to arbitration. Compl., Ex. B at Standard Terms at ¶ 20. This does not preclude this Court from granting a preliminary injunction, however, to preserve or restore the status quo, provided that the moving party satisfies the standards for preliminary injunctive relief. *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806, 812 (3d Cir. 1989); *Specialty Bakeries, Inc. v. RobHal, Inc.,* 961 F.Supp. 822, 829 (E.D.Pa.), *aff'd,* 129 F.3d 726 (3d Cir. 1997). An arbitration clause does not operate as an impermissible waiver of a judicial forum in violation of the NJFPA because it does not relieve a person of liability but rather determines the forum in which liability may be adjudicated. *Central Jersey Freightliner, Inc. v. Freightliner Corp.*, 987 F.Supp. 289, 300 (D.N.J. 1997), citing *Alpert v. Alphagraphics Franchising, Inc.,* 731 F.Supp. 685, 688 (D.N.J.1990). Moreover, a statutory provision that conflicts with the Federal Arbitration Act ("FAA") is invalid under the Supremacy Clause. *Id.*

The Act reflects a state policy of providing special protection for franchisees. *See* N.J.S.A. 10-2. The Supreme Court held that allowing states to protect franchisees by proscribing arbitration would open the door for state legislatures to "wholly eviscerat[e] Congressional intent to place

arbitration agreements 'upon the same footing as other contracts' and would permit states to override the FAA's policy favoring enforcement of arbitration agreements." *Id.* Because the FAA was intended to foreclose state legislative attempts to limit the enforceability of arbitration agreements, the NJFPA is preempted by the FAA in that regard. Accordingly, the arbitration clause in the parties' Distribution Agreement is enforceable.

### C.  <u>Preliminary Injunction Standard</u>

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). The movant must show: (1) a reasonable probability of ultimate success on the merits; (2) that the movant will be irreparably injured (or "harmed") if relief is not granted; (3) that the relative harm that will be visited upon the movant by the denial of injunctive relief is greater than that which will be sustained by the party against whom relief is sought; and (4) the public interest in the grant or denial of the requested relief, if relevant. *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir. 1992); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir. 1987). The first two factors are the "most critical," and the Court considers these "gateway factors" before the third and fourth factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Only if a plaintiff meets the threshold for these gateway factors does the Court consider the remaining factors; a plaintiff's failure to establish the gateway factors in its favor renders a preliminary injunction inappropriate. *Id*.

### i.   Likelihood of Success

The "success on the merits" prong is undoubtedly the injunction element upon which the New Jersey Franchise Practices Act exerts the most influence. As such, to determine whether plaintiffs will likely succeed on the merits, the Court must review the purposes and requirements

of the Act and apply them to the facts. At this very early stage of the case, on an application for injunctive relief, the movant need only "make a showing of reasonable probability, not the certainty, of success on the merits." *SK & F Co. v. Premo Pharm. Lab., Inc.,* 625 F.2d 1055, 1066 (3d Cir. 1980); *Central Jersey Freightliner, Inc,* 987 F.Supp. at 295 (plaintiffs need not "demonstrate that their entitlement to a final decision after trial is free from doubt").

Having determined the legal aspects of this case—whether Plaintiff has made a threshold showing under the Act, the Court turns to the equitable considerations bound up with any prayer for injunctive relief. Whether an injunction will be granted rests, *inter alia,* with plaintiffs' showing that they will be irreparably harmed if injunctive relief is withheld. The availability of adequate monetary damages undermines a claim of irreparable injury. *Frank's GMC Truck Ctr. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988).

### ii. Irreparable Harm

Next, to demonstrate irreparable harm, a movant has the burden of establishing a "clear showing of immediate *irreparable* injury." *Louis v. Bledsoe*, 438 F. App'x 129, 131 (3d Cir. 2011) (citation omitted) (emphasis added). "Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *ECRI,* 809 F.2d at 226. Moreover, "the injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno v. New Castle City.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The Third Circuit has repeatedly stated that "the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (citing *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 487 (3d Cir.2000)).

Economic injury, compensable in money, cannot satisfy the irreparable injury requirement. *Id.* (citation omitted). Where a plaintiff fails to adduce proof of actual or imminent harm which otherwise cannot be compensated by money damages, an injunction cannot issue. *Id.* The preliminary injunction must be the only way of protecting the plaintiffs from harm. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797 (3d Cir. 1989) (citations omitted). The United States Supreme Court has clarified irreparable harm as follows:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.... 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (quoting *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). More than a risk of irreparable harm must be demonstrated. *Acierno v. New Castle County,* 40 F.3d at 655 (citations omitted). "The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'" *Id.*

The termination of a long-standing business relationship can result in irreparable harm. *See Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233, 236 (D.N.J. 1976) (a preliminary injunction case asserting antitrust violations, breach of a distributorship contract, and violation of the New Jersey Franchise Practices Act by a beer manufacturer against a beer distributor, the court held that "the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of preliminary injunction") (citing *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d

34

Cir. 1970); *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir. 1969) (citing *Semmes* ); *Brennan Petroleum Prods. Co. v. Pasco Petroleum Co.,* 373 F.Supp. 1312, 1316 (D.Ariz. 1974); *cf.* D. Dobbs, Remedies § 12.18, at 884–85 (1973)). The court in *McCarthy v. Arnold Foods Co., Inc.,* 717 F.Supp. 325, 329 (E.D.Pa. 1989) allowed a plaintiff to successfully argue that there was irreparable harm in the termination of a fourteen-year-old wholesalership. The loss of goodwill may constitute irreparable harm for purposes of preliminary injunctive relief. *See Cooper Distributing v. Amana Refrigeration,* 1992 U.S. Dist. LEXIS 17918, *9 n. 4 (D.N.J. Jan. 23, 1992) ("*Amana I*"). To reiterate, the New Jersey Legislature has plainly identified this type of harm in the Act and stated, "… these protections are necessary to protect not only retail businesses, but also *wholesale distribution franchisees that, through their efforts, enhance the reputation and goodwill of franchisors in this State*." N.J.S.A. 56:10-2 (emphasis added).

Where, as here, a franchisor's decision to terminate a franchise is based on bona fide business reasons, an injunction would not be available *except for temporary relief. Westfield,* 86 N.J. at 467, 432 A.2d 48 (emphasis added). Plaintiff seeks a preliminary injunction to maintain the status quo pending an ultimate resolution of this litigation. The quoted language above from the *Westfield* court explicitly states that an injunction is available for "temporary relief" where the decision to terminate a franchise is based on "bona fide business reasons." As the Court summarized in *Atlantic City Coin & Slot Service Co. v. IGT*, 14 F. Supp. 2d 644, 670 (D.N.J. 1998), the inquiry is not whether "'Humpty Dumpty' [] will be put back together again at a later date. From plaintiffs' prayer for declaratory judgment, it is clear that this case is instead about keeping Humpty Dumpty from falling off the wall, having a great fall, and shattering into a million pieces in the first instance." *Id.*, at 670.

Here, Plaintiff alleges in the Verified Complaint that is set to lose its investment in the promotion of Defendants' products, entire good will and market share for MX Mooncakes and all the sales of its other products that routinely are purchased by Asian supermarkets alongside their MX Mooncakes orders. (Verified Complaint, at ¶¶ 91-105).  These allegations are sufficient to support a finding of irreparable harm at this stage of the litigation.

### iii. The Balance of the Relative Harms

In analyzing the relative harms, the potential loss of years' worth of investment in the promotion and marketing of Defendants' products has been determined to be the type of harm that the Act was designed to proscribe. *See Neptune T.V.,* 190 N.J.Super. at 163–64; N.J.S.A. 56:10-2. This must be balanced against the relative harm to Defendants. Defendants stand to potentially earn additional profits from a new distributor were an injunction to be denied and until the final decision of this or another court as weighed against the potential harm to Plaintiff.  The Court in *Amana I* found in a similar circumstance that equity favored the plaintiff in this circumstance. *Id.* at *5. The Court similarly finds here.

## III. CONCLUSION

For all of the foregoing reasons, the Court grants Plaintiff's motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65. Because the Court concludes that Plaintiff has demonstrated that it has a reasonable likelihood of success on the merits in its cause of action arising under the New Jersey Franchise Practices Act, it need not determine the merits of Plaintiff's other claims for relief.

The Court, in its discretion, will stay litigation pending arbitration. *See* FAA, 9 U.S.C. § 3 (authorizing court to stay proceedings pending arbitration where any issue in suit is referable to arbitration); *Central Jersey,* 987 F.Supp. at 300, citing *Optopics,* 947 F.Supp. at 824; *Allied Fire*

*& Safety Equip. Co. v. Dick Enter., Inc.,* 886 F.Supp. 491, 498 (E.D.Pa. 1995) (holding that court

has the discretion to stay proceedings pending arbitration where arbitrable claims predominate or

where arbitrable claims will have some effect on non-arbitrable claims); *Mutual Benefit Life Ins.*

*Co. v. Zimmerman,* 783 F.Supp. 853, 876 (D.N.J.) ("The decision to stay litigation of non-

arbitrable claims pending the outcome of arbitration is one left to the district court... as a matter of

its discretion to control its docket."), *aff'd,* 970 F.2d 899 (3d Cir. 1992).

      The Court concludes that a security bond is appropriate. Accordingly, counsel for Plaintiff

and Defendants shall meet and confer and make good-faith efforts to agree on a proposed order

setting a security bond under Fed. R. Civ. P. 65(c). By **April 18, 2022**, the parties shall jointly file

a proposed order setting a security bond; and, to the extent they cannot agree, the parties shall

submit a statement of the amount proposed by each side with supporting documents. Although the

submission shall not contain further argument regarding matters already decided, the Court

expressly holds that the parties' participation in this process shall be without prejudice to any

arguments made, or positions taken, by them at later stages in this litigation (including arbitration).

      An appropriate Order accompanies this Opinion.


DATED: April 4, 2022                          _____

                                     Julien Xavier Neals

                                     United States District Judge